The United States Court of Appeals for the Federal Circuit is now open and in session. God save the United States and this honorable court. Our first case for argument today is 2019-2155, Genentech v. Immunex. Mr. McLeod, please proceed. Good morning, Your Honor, and may it please the court, Luke McLeod on behalf of plaintiff's appellant Genentech. The BPCIA prohibits a biosimilar from launching its product without providing notice of commercial marketing under 42 U.S.C. section 262-L8. This case presents the question whether a biosimilar applicant like Amgen can provide L8 notice for a version of its product that it has not even asked FDA to approve. The answer to that question is no for three reasons. First, the plain text of section L8 prohibits notice prior to the application seeking FDA approval. Second, the statutory structure compels the conclusion that L8 notice is only effective when an application has been filed. And third, only Genentech's interpretation of the statute furthers the purposes of the BPCIA's carefully calibrated scheme. I'd like to start, if I could, with the text. The phrase, the biological product licensed under subsection K, necessarily ties section L8 notice to the application seeking FDA licensure. Counsel, this is Judge Moore. Just out of curiosity, why do you think it ties it to the last application, which was the supplemental application, and not one of the earlier applications? Your Honor, I think it ties it to both. The notice provision is triggered, in our view, by the filing of either the original application or supplemental applications that seek to change the scope of the license that the biosimilar has received from FDA. Counsel, you think any change of scope at all restarts the need for the 180 days. Suppose it was a very minor, minor, minor supplement, an ever so slight change to the wording on the label that was really of no significance or consequence, but they filed it. You think that starts the 180-day clock over again, even if there were no change to the manufacturing facility, no change to the underlying product itself? No, Your Honor, and let me clarify. It is only changes that would seek to change the scope of the license that the biosimilar receives from FDA. So, for example, changes like the changes that Amgen made here that require pre-approval by FDA before they can be implemented are the sort of changes that we're contemplating. Something that is ministerial, for example, changing the identity of the supplier of some component that the biosimilar uses in its processes, that's the sort of change that might be reported to FDA, perhaps in an annual report, but it is not the sort of change that we're talking about here because it would not alter the scope of the label. It would not permit the biosimilar to do something it couldn't do before. This is Judge O'Malley. You're talking about change in scope, and you say that needs approval, but what are we supposed to do? Make a determination as to what, in each instance, the FDA would decide needed approval, and we'd have to decide that in advance? Your Honor, I think that is an easy question to answer in this case because we know, as I said before, that the changes that Amgen made required FDA pre-approval. I think there could be questions in the middle. For example, if a biosimilar made a change through the changes being affected regulations that FDA has, some of those changes may alter the scope of the license, and some may not. But in this case, it's clear. When they are making changes to the manufacturing facility and to the labeling that goes to the product, those are significant changes that FDA, in its expert opinion, has decided require FDA pre-approval. So I think that's a very sensible line for the court to draw, that when there is a requirement of FDA pre-approval, as there was here, that is the sort of change that triggers the L-8 notice obligation. Why? The language of the statute, which is where you wanted to start, and for me, that really carries the water in this case. The language of the statute says they have to provide you notice of the biological product. If there were zero changes, and I understand this is not your argument, but if there were zero changes to the biological product, but just a change, for example, to the location of the manufacturing facility, that would require FDA approval. But that change would make no change to the underlying biological product. So since the statute only requires them to give you notice of the biological product, why would the 180-day time period restart? Your Honor, respectfully, I don't quite agree with the way that you're framing the statute. The statute requires notice prior to commercial marketing, not only of the biological product, full stop, but of the biological product that is licensed under Subsection K. Yes, but the product may not change just because there's a supplemental application based on, for example, the location of the manufacturing facility. That may have no impact on the biological product to be licensed. It just has an impact on the location of the manufacturing facility. And, Your Honor, in our view, that change to the manufacturing facility or to the label goes to the product that has actually been licensed by FDA, and that necessarily requires a look at what the biosimilars license permits it to do. So to be clear, your view is an extraordinarily broad one. Your view of how the statute should be interpreted is that any change at all to the application necessarily changes the biological product that has been licensed. Any supplemental application requires approval by the FDA. They all do. Every one. And so no matter how ministerial the change, even if it has no impact on the underlying product, your view is any change at all that is filed in the form of a supplemental application is going to restart the 180-day clock. No, Your Honor, that is not our view, and let me explain. It is only changes that are so significant that they change the scope of the license that the biosimilar has received from FDA. So the ministerial changes that you're referring to would not alter the scope of the license. But here we're talking about changes that require FDA preapproval, changes to the manufacturing facility, and changes to the license. And it's critical that those sorts of changes trigger the L.A. notice obligation because that is the only way the statutory scheme can work to resolve the sort of patent disputes that everyone agrees the statute is supposed to resolve. If Amgen's interpretation of the statute were accepted, the consequence would really be to render the L.A. notice requirement annullity and to prevent innovators like Janine. Counsel, I'm sorry. This is Judge O'Malley. But didn't the Supreme Court tell us, and Sandoz, too, that we have to look to the actual definition of biological product and not to incorporate the licensure requirements of Section K into what constitutes the product? In other words… Your Honor, what the… Go ahead. I'm sorry. Go ahead. No, you go ahead. If you understand my question, then it's fine. I believe I do, Your Honor. But if I don't, I'm sure you'll correct me. What the Supreme Court said in the Sandoz case was that the biological product can be the subject of an L.A. notice prior to receiving a license from FDA. And in answering that question, the Supreme Court did not weigh in on the issue that's presented in this case, which is what happens when the biosimilar has a license and it seeks to change the scope of that license. That issue just wasn't presented in that case because, first of all, Sandoz had not received a license from FDA. And second of all, there was no allegation by Amgen in that case that Sandoz's product had changed in a meaningful way after the filing of the initial application. Now, it is true that the Supreme Court recognized that the product that is the subject of the application can change over the course of the application cycle. And there's the language that Amgen quotes in its brief about how nothing in the L.A. notice obligation turns on the precise status or characteristics of the biosimilar application. But it's important to understand the context in which that statement arose. Amgen was making an argument, a per se argument, that there could be no notice provided prior to licensure. And it was pointing out that changes might occur in support of that argument. So the status and characteristics of the application that the Supreme Court was referring to there are the status or characteristic of whether the application has been approved or not. The Supreme Court was not weighing in on whether L.A. notice is triggered when, as here, there are significant changes to the scope of the license. And in our view, this Court is riding on a clean slate on that question. That's not to say that the Supreme Court didn't say things that are relevant to the disposition of this appeal. The Supreme Court reiterated that the purpose of the L.A. notice provision is to allow for the resolution of disputes over patents prior to the launch of the biological product. And as I mentioned in my opening, that is a purpose that is only accomplished if the statute is interpreted as Genentech suggests. Can I ask a question? Counsel, I have a question that I want to ask because it's a little bit off of this topic. But why is it that you didn't – if your primary concern right now is the infringement of the process patent, why didn't you seek an injunction based on an infringement of a valid and infringed patent and not just hang your hat on this notice statutory argument? A couple of responses to that question, Your Honor. First, in our view, the L.A. notice requirement is enforceable and relevant regardless of whether we're seeking an injunction based on our patent rights. And that's a position that Amgen took when it was before this court as an innovator. It argued successfully that the district court in its case had erred in refusing to grant an injunction for an L.A. violation simply because Amgen was not also enforcing its patent rights. In our view, that was the correct result then and it remains the correct result now. The second point, Your Honor, is that we have not had the opportunity to take the sort of pre-launch discovery into both the patent merits and the injunctive relief factors that the statute contemplates. And for that answer, I want to explain a little bit about the procedural history because it is a little complicated. There are multiple litigations below between Genentech and Amgen. One of them, the 1407 action, is related to the submission of Amgen's initial application. And in that case, there has been discovery, and the district court is moving the case for trial in November of... But in that case, you also received a discovery that indicated the change in the manufacturing facility, did you not? We did, Your Honor, and as a result of that discovery, we filed a second case, the 602 action, which is the action that actually underlies this appeal. And in that case, we have not even had a Rule 16 conference yet. Amgen filed a motion to dismiss that has not been ruled on. But it doesn't mean that you couldn't have brought an injunction in that case even without the Rule 16 conference. Well, Your Honor, as I said, we have not had the discovery that's necessary to determine whether an injunction would be appropriate. Discovery not only into whether the shiratory patent, the patent that's only asserted in the 602 action is infringed, but also discovery on the merits of the injunctive release factors. And that is critical discovery that we need. The point of the L-8 notice provision is to actually give us notice. It's an actual notice standard, and Amgen was obligated under that standard to let us know its plans so that we could avoid having a hurried situation where the district court has to frantically resolve a preliminary injunction motion based on either our L-8 violation or our patent rights. And that is a result that is not accomplished under Amgen's interpretation of the statute. Okay. Thank you. Thank you. Okay. Counsel, would you like to save the remainder of your time for rebuttal? I would, Your Honor. Thank you. Okay. Very good. So let's hear from your opposing counsel. Mr. Lampkin, please proceed. Thank you, and may it please the Court. Section 262 L-8 requires advance notice of something specific, commercial marketing of the biological product licensed under subsection K. Biological product is a defined term. It's a physical substance, a virus or protein applicable to the prevention, treatment, or cure of disease. Here, the biological product licensed under subsection K is the Mvassi antibody, the Vasizumab AWWB. That's the protein applicable to the treatment of cancer. That's the licensed biological product, whether made in Rhode Island or in Thousand Oaks. And here, Amgen can notify Genentech of its intent to market that biological product, Mvassi, in October of 2017. Mr. Lampkin, let me ask you, this is Judge O'Malley, I'm sorry. Let me ask you, your friend on the other side, Mr. McCloud, specifically said that he was not saying that every supplement would trigger a new notice. And is it your position that there is no form of supplement that would ever trigger a new notice? In other words, on the opposite side of that scale? So I think the answer is that as long as your supplement is a change to the existing license and it is the same biological product, it would not trigger a new notice. So long as it is the same biological product, licensed under subsection K, you would not require a new notice. Now, the FDA knows when something transforms into a new product. There's an example in the industry that's well known for a company called Genzyme. And Genzyme had a product called Myozyme. And when it tried to scale up production, it actually produced differences. And so the FDA didn't allow Genzyme to proceed with a supplement. It had to compile a whole new ABLA. It had to rename its product Lumizyme. It had to start over again. So the FDA knows when you have a new product and you try and change it and try and put it through to a supplement, it will require a new application. And that application is the statutory trigger for a whole bunch of disclosures under L2, for example. But isn't there a possible mischief here? I mean, with all of these, often a process patent is one of the things that is where infringement is alleged. Because a lot of times it's hard to create the generic without using a patented process. And so doesn't this imply that there could be a bait and switch that you could say, as you did here, that we're going to use X process and then turn around and use Y process at the last minute? Doesn't that create a potential problem? I don't think so. And that's because LA is about timing. It's a notice of advanced marketing. It's not meant to be, and it isn't an informational disclosure about the biosimilar or its production. Congress addressed those issues in other provisions and in other ways. For example, Subsection L2A requires applicants to give the reference sponsors a copy of their biosimilar application within 20 days of its acceptance. And it says that you also have to give, quote, information that describes the process or processes used to manufacture the biological product. So Congress knew how to specify disclosure of manufacturing information. It did so in L2. But it didn't do that in L8 because L8 is about timing. It's a heads-up notice about launch. It's not an opportunity for further informational disclosures about the means of production. Congress also addressed access to information through provisions like L3 to L6, through which parties can exchange information about patents and potential infringement. And there's discovery. The BPCI doesn't suspend the rules of civil procedure or the utility of discovery to get this sort of information. In fact, it facilitates discovery by creating that artificial act of infringement. It gets the parties into court faster. And L8C has a specific provision for expedited discovery and exchange of information in connection with preliminary injunction. And that system of discovery worked exactly as intended here. Genentech received the third supplement, identifying Rhode Island as the initial manufacturing site, in August of 2018, two days after it was filed. And it wasn't until 11 months later that Genentech filed for its preliminary injunction. It had more than that 180 days' notice in order to decide whether it wanted to seek that injunction. And even today, it still hasn't filed an injunction on the basis of the infringement of a patent, the Shiratori patent, for example. It only seeks an injunction based on the supposed violation of the 180-day principle. So even apart from those policy concerns, though, the statute is actually clear. And the Supreme Court has told us that it is that clear. Oh, I should mention that this discovery they had in the 1407 matter, the district court in that case specifically said that that discovery was mutable in this case. That's in docket number 318. So there's no real excuse for not using the discovery in that case if they wanted to seek a preliminary injunction or invoking L8C in order to get in the information that they wanted. But we've got the text aside, policy aside, the Supreme Court actually told us that the outcome is here. With respect to what it means for a product to be licensed under subsection K, the Supreme Court in Sandoz said, and I quote, that it merely reflects the fact that the product must be licensed on the date of first commercial marketing. So the phrase licensed under subsection K doesn't mean the license specifications have to be locked in when that notice is given. You're somehow not locked into the particulars when the notice is given. Sandoz says exactly the opposite. The court recognized that the biosimilar specifications, quote, may change during the application process. And it understood that those changes could be pretty significant. For example, it cited this court's opinion. This court's opinion saying that changes to manufacturing processes or changes to therapeutic uses might occur. But the Supreme Court said those don't matter because nothing, I'm quoting again, nothing in 262L88 turns on the precise status or characteristics of the biosimilar application. And that makes sense because L88 is about timing. It's about a heads-up notice of launch. It's not a supplement of additional information about the biosimilar characteristics or how it's made. And the Supreme Court in Genentech would do the exact opposite. It would turn L88 to turn entirely on the status of the licenses or the applications in existence at the time of the notice. So in its view, a notice is effective only for the biosimilar specifications in place when it's given. So you'd have to do a second L88 notice if it is a supplement, a third L88 notice if it's not a supplement, a 16th L88 notice, and each of these could be accompanied by an exchange of information and litigation. But Sandoz explained. The Supreme Court told us in Sandoz that 262L88 contains, quote, a single timing requirement, not a multiplicity of disclosure requirements. And that makes sense. This is a special provision given to drug manufacturers alone. Nowhere else in patent law does anybody get this heads-up. And Congress recently determined that you get that heads-up once when the product is going to come to market. It didn't intend to give parties or makers sort of a notice-based superintendence, a permanent notice-based superintendence over changes to the product after the notice is given, which is the effect that Amgen's position would have. If I could turn quickly to the argument about evasion. Look, we did not in any sense mean to say that there's no contention here. There couldn't be no contention here that we intentionally evaded presenting this information. Amgen followed what is a standard practice, which is that in its initial notice, in its initial application, it used the place where its clinical product was produced. Later in the process, when you get closer to commercial marketing and you have a better idea of how much product you're going to need, when it's going to be launched, you choose a place to produce redundancy or other product. So at what point in the first litigation did that change in manufacturing facility get disclosed during discovery? So the first time it was disclosed was actually in May, but it was certainly disclosed no later than August 20, 2018, when Amgen disclosed its third supplement to Genentech, and that third supplement specifically pointed out that we were going to be using Rhode Island as a production facility. Genentech did not seek an injunction then or amend its complaint to a certiorari at that point. It didn't amend its complaint or seek an injunction when, in January, it was notified that the FDA had approved the third supplement. It didn't seek an injunction until July of 2019, which was 11 months after it received the notice. But even then, it started on the basis of the 180-day notice provision, not underlying patent certiorari. And even today, it has yet to assert a right to an injunction based on the infringement of a valid patent. Its sole basis, 21 months after the disclosure of that third supplement, is the 180-day notice provision, 21 months after having received notice of this particular change. If the Court has no further questions, I'd be happy to see the remaining of my argument time. I'm sorry. In the elected Court, we'd like to discuss the public interest factor, because the District Court, at no point, the District Court made a specific finding that public interest would be deserved. And I don't think Genentech has shown that there is any basis for abuse of discretion or clear error in the District Court's finding on that. And that, too, would require affirmance of the judgment below. If there are no further questions, I'd be happy to see the remainder of my time. Okay. This time, you'll stick with it? Yes. I promise. Okay. Then, yes, please see the rest of your time. Okay. Mr. McCloud, you have some rebuttal time? Thank you, Your Honor. Let me pick up on the last point that Mr. Lampkin mentioned, which is the public interest factors. In our view, the District Court didn't make any finding as to the public interest. There is, it's true, in footnote 6 of the opinion, a statement about the public interest. But we don't view that as a finding. I think if you read the opinion as a whole, it's clear that the District Court was resting its decision to deny our motion on its legal analysis. And in our view, that legal analysis is flawed. Let me return to the point about bait and switch that was discussed with Mr. Lampkin, because I do think that's a significant problem. And we have examples of that in this case. So take, for example, the DuPont patent, which is discussed in our briefs. It is a patent that Genentech has on the treatment of ovarian cancer with Avastin. And that is an indication for which Genentech has orphan drug exclusivity. But it's highly likely that Amgen at some point in the future will seek to amend its label to add the ovarian cancer invitation. Under Genentech's view of the world, when that occurs, Amgen will have to give L.A. notice so disputes over DuPont infringement can be resolved. But under Amgen's position, we may not even know that Amgen intends to revise its label until the new product hits the market. And the result would be exactly the sort of hurried and chaotic motions practice that everyone acknowledges L.A. is intended to prevent. Value-similar manufacturers like Amgen could apply for approval of Potemkin versions of their process, the version that implicates the fewest of the innovators' patents, give L.A. notice, and then after giving notice, file supplemental applications that reveal the real process and the real label that they intend to use. Congress could not have intended to create a statutory scheme that could be so easily gained. We know that Congress didn't create that scheme from the text of Section L.A. and also from the related provisions, including Section L.I., which focuses the attention of the parties and the courts on the status of the application. As this court has held under Section L.I., no infringement suit can be brought because no case of controversy exists until the application has been filed. It would be nonsensical, I would submit, for Congress to have intended parties like Amgen to give L.A. notice at a time when no L.I. infringement lawsuit could be brought. And the final point I want to make is that this is not going to lead to a flood of meaningless notices, as Amgen has suggested, for a variety of reasons. There is no reason to think that biosimilars like Amgen will make the sort of changes that we're talking about a number of times. Unless there are further questions, we ask that the district court be reversed and that we receive an order enjoining Amgen from marketing the current version of its embossy product until it complies with Section L.VIII. Okay. We thank both counsel. The case is taken under submission. That concludes our arguments for today. The Honorable Court is adjourned until tomorrow morning at 10 a.m.